126 So.2d 689 (1961)
Ivo J. STAKELUM, Jr.
v.
Geneva Sue TERRAL.
No. 29.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 1961.
Rehearing Denied February 20, 1961.
Bossetta & Bossetta, Gasper Bossetta and Richard Dowling, New Orleans, for plaintiff-appellant.
Cassibry, Jackson & Hess, Ralph N. Jackson, New Orleans, for defendant-appellee.
YARRUT, Judge.
Plaintiff sues defendant for the annulment of their marriage, claiming he was forced to give his consent by threats of bodily violence and death, both to himself and his parents, by defendant and members of her family. The District Judge dismissed plaintiff's suit, and he has taken this appeal.
The story heard by the District Judge, and read by us from the record, is: Plaintiff and defendant were students attending medical school in New Orleans. Both are in their early "twenties". She hails from a small Texas town, and he is a life-long resident of New Orleans. Having fallen in love, and believing he would marry her, she engaged in premarital sexual intercourse on many occasions. As they sowed, they reaped. She became pregnant and promptly advised him. He promised to marry her, and made several voluntary dates for the ceremony, but, on each occasion, found some excuse for postponement.
When the pregnancy developed to its sixth month, she became panicky and advised her sister in Texas, who was married to a detective on the police force of a large Texas city. Defendant's sister and brother-in-law came to New Orleans to attend the wedding after plaintiff fixed the ceremony for Friday, November 29th. They arrived in New Orleans on Wednesday (27th). Defendant and her brother-in-law spoke to plaintiff over the telephone and asked that he advance the ceremony to the 28th (Thanksgiving Day) because they had to return to Texas on the 29th, but wanted to be present at the wedding. Plaintiff, first reluctant, was persuaded to agree to the 28th. Plaintiff contends he agreed only because defendant and her brother-in-law threatened him and his parents with death.
On the morning of the 28th plaintiff and defendant, with their relatives, embarked by automobile for Mississippi; plaintiff and *690 his parents in one automobile; defendant, her sister and husband (police-detective) in the other. Plaintiff suggested Mississippi as the place for the ceremony. They stopped at Picayune at the office of a Justice of the Peace. He agreed to perform the ceremony, but advised them first to go to Bay St. Louis for a license. Plaintiff and defendant went to Bay St. Louis, obtained the license, returned to Picayune and were there married by the same Justice of the Peace. After the ceremony an unsettled argument ensued between plaintiff and defendant over financial support for herself and the expected baby. All then left the scene of the wedding, plaintiff with his parents for New Orleans; defendant with her sister and husband for Texas. They have been separated ever since.
Having received no word or financial assistance from plaintiff, and being in need of financial assistance for doctor, medical and hospitalization for her pregnancy and delivery, she wrote plaintiff in December, but received no reply. She wrote again in January. This time she threatened to see the District Attorney if he failed to assist her. Plaintiff's only reply was this annulment suit (filed February 10, 1958).
With reference to the threats over the telephone, defendant and her brother-in-law both swear positively no such threats were made. While plaintiff's parents corroborated him regarding the threats, they testified from hearsay, namely, what their son told them had been said to him over the telephone.
Because defendant's brother-in-law usually carried a pistol as a police officer in Texas, plaintiff sought to prove he carried a pistol in New Orleans, concealed on his person at all times, as a constant threat to plaintiff. The officer, his wife and defendant, all swore positively he carried no pistol at any time. Neither plaintiff nor his parents saw a pistol or heard threats on the way to, or during, the wedding ceremony.
The Justice of the Peace testified that, during the ceremony, everything was normal, nobody was frightened, and no threats were made. After the wedding, however, as the parties did not embrace and kiss, he remarked he did not know whether the ceremony was a wedding or a wake. He spoke to plaintiff and his parents in their automobile outside his office. When he repeated the above remark to them, one of them replied they would rather not discuss the matter.
Notwithstanding plaintiff testified defendant had sexual relations with many other fellow-students, not one was produced as a witness. Plaintiff did admit he had intercourse with her on many occasions, both before and after he knew of her pregnancy, yet sought, by innuendo, to show that another of her alleged intimates was responsible.
When plaintiff's parents were asked why they did not notify the police when threatened, they said they did not have time. All they need have done was to refrain from accompanying their son to Mississippi; alerted the New Orleans or Bay St. Louis authorities; or informed the Justice of the Peace before the ceremony, or when he came to their automobile, after the ceremony, to remark that the ceremony appeared to be a wake. Neither defendant nor her brother-in-law was present at that time, so any one of them could have spoken freely, even if previously silent under fear or duress.
It is incredible that a detective of the police force of a large Texas city would, away from home, carry a pistol and threaten death to force the marriage of an `in-law', and thereby suffer possible criminal prosecution and jail sentence, with the resulting loss of his reputation and position as a police officer.
It is also incredible that plaintiff, believing another medical student was responsible for her pregnancy, would continue intercourse with her. His natural reaction, if he were sincere, would have been to shy *691 away and sever all relations. In continuing such relations he, in effect, confessed and affirmed his paternity.
The whole story, as developed by the testimony, convinces us, as it did the District Judge, that no threats of bodily harm or death were ever made; that everything said or done was to appeal to plaintiff's manhood and decency; that plaintiff and his parents had every opportunity to notify the New Orleans or Bay St. Louis police, or the Justice of the Peace.
It is apparent this annulment suit is plaintiff's delayed answer to defendant's demands for financial assistance for herself and baby, with the hope of avoiding that responsibility.
The basic law controlling this case is found in LSA-Civil Code Arts. 91 and 110, to the effect that no marriage is valid when extorted by violence; and that marriages celebrated without the free consent of married persons may be annulled by the one whose free consent was not given, provided the marriage has not been freely consummated after celebration.
We can find no case in our jurisprudence which holds that entreaties to, and persuasion of, the apparent father of their relative's unborn child to do the manly and decent thing by marrying the pregnant mother, is the violence and threats contemplated by the codal articles.
As the rule of law is clear, the facts must control. The case nearest in point is that of Collins v. Ryan, 49 La.Ann. 1710, 22 So. 920, 922, 43 L.R.A. 814, wherein the court, after first noting that the plaintiff-husband made no complaint during the marriage ceremony and said "I do" when asked if he would take the lady for his wife, concluded:
"* * * Another witness made a statement similar to that of the first one interrogated, and confirmed his testimony to the effect that plaintiff professed a willingness to do what was right by the girl. Aside from the testimony we have quoted, there are a great many details of similar character and import; and all of them, taken together, have given us the impression that originally it was neither the purpose nor expectation of the plaintiff to marry the defendant, but the relations of the defendant insisted upon the plaintiff marrying the girl, believing that he had seduced and ruined her, and that to marry her was his duty under the circumstances; that, upon due consideration of the pressure which was brought to bear upon him, and of his duty to repair a wrong he had confessedly done the girl, he yielded a reluctant and passive consent to the performance of a marriage ceremony. We are of opinion that he has not presented a case which entitled him to relief."
Plaintiff has failed to carry the burden of proving his case by a preponderance of the evidence. We can find no error in the judgment of the District Court and it is affirmed, at the cost of plaintiff.
Affirmed.
SAMUEL, Judge (concurring).
I agree with the result reached herein but prefer to base my decision squarely on the proposition that, even assuming the factual contentions of the petitioner to be correct, the real and immediate danger required to vitiate the consent is not present.
For this reason I respectfully concur.